# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GRAHAM NICHOLS,

   Plaintiff,

v.           No. CIV 13-961 JAP/SCY

SHERIFF DAN HOUSTON,
BERNALILLO COUNTY SHERIFF'S
DEPARTMENT, DEPUTY SCOTT MAGEE,
DEPUTIES JOHN DOE 1-5, in their
individual and official capacities,

   Defendants.

## MEMORANDUM OPINION AND ORDER

On February 19, 2015, Sheriff Dan Houston, the Bernalillo County Sheriff's Department, and Deputy Scott Magee ("County Defendants") filed COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 53) (Motion for Summary Judgment), seeking dismissal of Plaintiff's COMPLAINT FOR PERSONAL INJURY DAMAGES (Doc. No. 1) (Complaint). On March 9, 2015, Plaintiff Graham Nichols (Plaintiff) filed a RESPONSE TO MOTION FOR SUMMARY JUDGMENT (Doc. No. 56) (Response). On March 24, 2015, County Defendants filed a Reply. (Doc. No. 57). After careful consideration of the pertinent law and the pleadings, the Court will grant in part and deny in part County Defendants' Motion for Summary Judgment.

## Background

Plaintiff's claims arise out of a traffic stop in Albuquerque, New Mexico. Mr. Nichols, the driver of the vehicle, is hearing and speech impaired. COMPLAINT FOR PERSONAL INJURY DAMAGES (Complaint ¶ 4) (Doc. No. 1). On October 20, 2011, at approximately 1:30

a.m., Deputy Scott Magee stopped Plaintiff's vehicle based on Deputy Magee's observation that

the vehicle had no functioning tail lights. After obtaining Plaintiff's "ID card" and running it

through the NCIC database, Deputy Magee learned that Plaintiff was driving with a suspended

driver's license and that he had an outstanding misdemeanor arrest warrant. Deputy Magee

called for backup to arrest Plaintiff. Deputy Russell Broyles arrived at the scene and assisted

Deputy Magee in arresting Plaintiff.

Plaintiff contends that Deputy Magee and two or three unidentified Bernalillo County

Sheriff's Department deputies used excessive force in arresting Plaintiff on October 20, 2011.

The Complaint alleges that "Defendants forcibly pulled Plaintiff from his vehicle and slammed

him to the ground on his face, injuring Plaintiff's head, back and arms." Complaint ¶ 5.

According to Plaintiff, County Defendants injured Plaintiff's diabetic fistula[1] on his right arm

which caused extensive problems with Plaintiff's ongoing dialysis. *Id.* Plaintiff also asserts that

County Defendant deputies refused to communicate in writing with him during the arrest and

failed to provide an interpreter for the hearing impaired in violation of sheriff's department's

standard operating procedures (SOPs).

County Defendants deny Plaintiffs' allegations and argue they are entitled to summary

judgment or qualified immunity with respect to all of Plaintiff's claims. Deputy Magee contends

that when he attempted to place Plaintiff in handcuffs, Plaintiff struggled and pulled away from

the deputies. Deputy Magee and Deputy Broyles took Plaintiff to the ground, "via an arm-bar

takedown," in order to handcuff Plaintiff. Deputy Magee represents that, after handcuffing

---

[1] Before an individual begins dialysis treatments for kidney disease, doctors may recommend a minor surgical procedure called arteriovenous (AV) fistula that involves direct connection of an artery and a vein. "Creating an AV fistula allows arterial pressure to enlarge the vein, over time, better enabling it to receive the volume of blood coming back into the body." http://www.uwmedicine.org/health-library/Pages/arteriovenous-fistulas-for-dialysis-access.aspx (3/2015).

Plaintiff, he showed Plaintiff several written notes explaining there was a warrant for Plaintiff's arrest and that Plaintiff was under arrest.

Deputy Magee noticed a laceration on Plaintiff's forehead, resulting from the "takedown," and called emergency medical services. Deputy Magee removed Plaintiff's handcuffs so that Plaintiff could get into an ambulance. Plaintiff signed a citation for driving with non-working rear tail lights and for driving with a suspended driver's license although Plaintiff claims he did not understand why he was being arrested and was not aware that he was driving with a suspended driver's license. Deputy Magee contends that he showed Plaintiff a note stating Plaintiff was released from custody but that he would receive a criminal summons in the mail. Plaintiff requested that he be taken to Presbyterian Hospital for treatment. Presbyterian Hospital medical staff noted that Plaintiff's only complaint that night was a right forehead abrasion.

Plaintiff's Complaint asserts seven claims against all Defendants: 1) deprivation of due process protections and use of excessive force in violation of the Fourteenth Amendment (Count I); 2) Assault (Count II); 3) Battery (Count III); 4) False Imprisonment (Count IV); 5) "Outrage" (Count V); 6) failure to train and supervise Defendants in violation of 42 U.S.C. § 1983 and New Mexico state law (Count VI); and 7) lack of reasonable suspicion to detain Plaintiff and lack of probable cause to seize Plaintiff in violation of the Fourth Amendment (Count VII).

## Summary Judgment Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When applying this standard, the Court examines the factual record and reasonable

inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain [his] claim." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

When an individual defendant asserts qualified immunity, the procedure for analyzing this defendant's motion for summary judgment is slightly different. "The doctrine of qualified immunity protects public or government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant asserts qualified immunity, the plaintiff bears the heavy burden of satisfying a "strict two-part test." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation omitted). The plaintiff must establish 1) that the defendant violated a constitutional or statutory right, and 2) that the right was clearly established at the time of the defendant's conduct. *Courtney v. Oklahoma ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013).

"If the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity." *Hesse v. Town of Jackson, Wyo.,* 541 F.3d 1240, 1244 (10th Cir. 2008) (quotations omitted). But, if the plaintiff succeeds in carrying his two-part burden, the burden shifts to the defendant who must show there are no remaining material issues of fact that would defeat the claim of qualified immunity. *Walton v. Gomez*, 745 F.3d 405, 412 (10th Cir. 2014).

**Discussion**

### I. FOURTH AMENDMENT CLAIM (Count VII)

The Fourth Amendment protects individuals from unreasonable seizures. U.S. Const. amend. IV. "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 135 S.Ct. 530, 536 (2014) (citation omitted). In *United States v. Botero–Ospina*, the United States Supreme Court set forth the standard governing the reasonableness of traffic stops: "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." 71 F.3d 783, 787 (10th Cir.1995) (en banc), *cert. denied*, 518 U.S. 1007 (1996). The Court's sole inquiry in traffic stop cases "is whether [a] particular officer had reasonable suspicion that [a] particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (citation omitted). Reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. Calif.,* 134 S.Ct. 1683, 1687–88 (2014) (citations omitted).

Plaintiff's Complaint alleges that Defendants lacked reasonable suspicion to detain him when Deputy Magee stopped Plaintiff's vehicle, Complaint ¶ 45, but in his Response, Plaintiff admits that "he cannot contest the Defendant's (sic) prima facie case for summary judgment on the issue of the initial stop," Response at 1. It is undisputed that Deputy Magee had a reasonable suspicion to believe that Plaintiff had broken the law when the deputy observed Plaintiff driving a car without functioning tail lights. Motion for Summary Judgment, Undisputed Material Fact (UMF) No. 1. Thus, the initial stop of Plaintiff's car did not violate the Fourth Amendment.

Plaintiff also asserts that Defendant Magee lacked probable cause to seize him. Complaint ¶ 46. Because Plaintiff argues that Defendants' actions after the initial stop violated Plaintiff's civil rights, it is not clear if Plaintiff concedes in his Response that this claim also must fail. *See* Response at 1, 14. It is well settled that a "traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Kitchell*, 653 F.3d 1206, 1217–18 (10th Cir.) (citation omitted), *cert. denied,* 132 S.Ct. 435 (2011). "Probable cause to arrest exists … when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir.2004) (citation and quotation marks omitted). If an officer has probable cause to believe that an individual "has committed even a very minor criminal offense in his presence, [the officer] may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

The undisputed facts demonstrate that Defendant Magee obtained Plaintiff's "ID card," checked Plaintiff's information through the National Crime Information Center (NCIC) database, and learned that Plaintiff was driving with a suspended driver's license in violation of the law and that he had a misdemeanor arrest warrant. UMF No. 9. Plaintiff did not produce any evidence to the contrary, In fact, Plaintiff admits that sometime before October 20, 2011, Plaintiff's driver's license had been suspended, which resulted in the issuance of a misdemeanor warrant for his arrest. Plaintiff does not dispute that Deputy Magee confirmed there was a warrant for Plaintiff's arrest. UMF Nos. 10, 11. Because Deputy Magee had probable cause to arrest Plaintiff, the arrest of Plaintiff did not violate the Fourth Amendment.

Plaintiff did not raise any genuine disputes of material fact to support his Fourth Amendment claims of an alleged unlawful stop or of an unlawful arrest.[2] Accordingly, the Court grants summary judgment in favor of the County Defendants on the Fourth Amendment claims in accordance with Fed. R. Civ. P. 56(a) and will dismiss the Count VII Fourth Amendment claims with prejudice.

## II.   EXCESSIVE FORCE CLAIM (Count I)

### A.   Whether Fourth or Fourteenth Amendment Applies

Depending on the circumstances, an excessive force claim may be asserted under the Fourth, Fifth, Eighth, or Fourteenth Amendments, thereby requiring application of different legal tests. *Booker v. Gomez*, 745 F.3d 405, 418–19 (10th Cir. 2014) (citation omitted). For example, a Fourth Amendment excessive force claim "depends on the objective reasonableness of the defendants' actions." A Fourteenth Amendment excessive force claim turns on additional factors, including "the motives of the state actor." *Id.* at 419 (citation omitted). "[T]he Fourteenth

---

[2] Based on the Court's ruling, it need not examine the County Defendants' assertion of entitlement to qualified immunity on the Count VII Fourth Amendment claims.

7

Amendment governs any excessive force claim brought by a 'pretrial detainee'—one who has had a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Id.* (citation omitted). Excessive force claims by federal immigration detainees, for example, are analyzed under the Fourteenth Amendment. *Id*.

In deciding how to characterize an excessive force claim, the Tenth Circuit Court of Appeals explained:

> Any force used "leading up to and including an arrest" may be actionable under the Fourth Amendment's prohibition against unreasonable seizures. By contrast, claims of excessive force involving convicted prisoners arise under the Eighth Amendment. And when neither the Fourth nor Eighth Amendment applies— when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment—we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities.

*Id.* (internal citations omitted).

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the United States Supreme Court held that "*all* claims that law enforcement officers have used excessive force … in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* The analysis shifts to the Due Process Clause at some point after an arrest. *Pierce v. Gilchrist*, 359 F.3d 1279, 1285–86 (10th Cir. 2004).

Plaintiff alleges that County Defendants used excessive force during his arrest in violation of the Fourteenth Amendment. Complaint ¶¶ 10–14. However, the Court concludes that

Plaintiff's allegations relate to force used "leading up to and including an arrest," which are more properly examined under the lens of the Fourth Amendment. Thus, the Court will dismiss Plaintiff's Count I Fourteenth Amendment excessive force claim with prejudice and analyze the excessive force claim under Fourth Amendment standards.

      B.  <u>Fourth Amendment Standard</u>

In order to succeed with a Fourth Amendment excessive force claim, a plaintiff must show he was seized. *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1250 (10th Cir. 2008) It is undisputed that County Defendants seized Plaintiff when Deputy Magee stopped Plaintiff's vehicle, which then led to detaining and arresting Plaintiff. *See discussion supra.*

The consideration of every Fourth Amendment excessive claim starts with the recognition that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat." *Graham,*, 490 U.S. at 396. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citations and quotation marks omitted).The force employed during an arrest is excessive only if it is greater than reasonably necessary "from the perspective of a reasonable officer on the scene." *Id.* at 396–97; *Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007).

Three non-exclusive factors guide the reasonableness analysis: 1) the severity of the crime; 2) the level of threat posed by the suspect to the officer and public safety; and, 3) the amount of resistance to or compliance with the arrest exhibited by the suspect. *Graham*, 490 U.S. at 396 (citation omitted). In evaluating these factors, the Court keeps in mind "that police

officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Other factors may be considered depending on the circumstances of each case. For example, a particular use of force may depend "in part on whether the law enforcement officers knew or should have known that the individual had special characteristics making him more susceptible to harm …." *See Aldaba v. Pickens*, 777 F.3d 1148, 1156 (10th Cir. 2015) (discussing cases where courts considered special characteristics of a subject who had diminished capacity). Ultimately, the question is "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

C.   Non-Exclusive Factors

1.   *Severity of the Crime*

Although Deputy Magee had reasonable suspicion to stop Plaintiff's vehicle and probable cause to arrest him, the initial stop stemmed from a traffic infraction. The misdemeanor arrest warrant also arose from a traffic violation. UMF Nos. 9, 10; Plaintiff Graham Nichols Dep. at 20. Plaintiff was not suspected of having committed a felony crime or a dangerous crime.

2.   *Level of Threat and Resistance to Arrest*

There is no indication in the record that Deputy Magee felt threatened by Plaintiff. Deputy Magee's call for backup was "standard procedure if someone is going to be taken into custody." Scott Magee Dep. at 13. Moreover, Deputy Magee described the circumstances of handcuffing Plaintiff as not very "dynamic." "It was a controlled situation." *Id.* at 20. Deputy Broyles testified that Plaintiff did not "try to run or he didn't try to head butt you or hit or

anything." He was just "tensing up and not letting [the deputies] easily put [his] arms behind his back." Russell Broyles Dep. at 35.

There is evidence, however, that Plaintiff resisted being handcuffed by pulling his arms away from Deputy Magee when Deputy Magee attempted to handcuff Plaintiff. UMF No. 14.[3] Plaintiff admitted that Deputy Magee and three other officers[4] could have thought Plaintiff was trying to "fight" Deputy Magee when Plaintiff pulled away from Deputy Magee. Plaintiff testified that "the three of them thought I was trying to fight Deputy Magee and I wasn't. I lost my balance …." "[F]rom their perception, it could seem that I was trying to fight." Plaintiff's Dep. at 35, 36, 63. The Court concludes that under the circumstances a reasonable officer in Deputy Magee's position could have believed he needed to exercise some level of force in order to contain and handcuff Plaintiff, who was resisting being handcuffed.

### 3.  *Amount of Force Used*

The parties give significantly different versions of how much force the deputies used. County Defendants contend that Deputy Magee and Deputy Broyles used a reasonable amount of force in bringing Plaintiff to the ground "via an arm-bar takedown," to handcuff him and that Plaintiff suffered only a minor laceration to his forehead. UMF Nos. 18,[5] 31, 47. According to

---

[3] In his Response at 4, Plaintiff stated that he disputed UMF No. 14, but he provided no evidence to contradict Deputy Magee's testimony that Plaintiff pulled away from him when Deputy Magee tried to handcuff Plaintiff. Instead, for five to six pages of his Response, Plaintiff quoted deposition testimony of officers about police SOPs concerning the arrest of a hearing-impaired person. Response at 4–9. Plaintiff attached the same deposition transcripts to his Response. Testimony about the SOPs does not raise a genuine dispute as to whether Plaintiff pulled away from Deputy Magee. Moreover, Plaintiff is confused about which deputy was testifying when he supposedly quoted testimony by "Deputy Broyles," "the other deputy involved in the arrest." Response at 6. The testimony Plaintiff recited at pages 6–7 of the Response was Deputy Magee's testimony, not Deputy Broyles' testimony.

[4] There is evidence that Deputy Broyles provided backup support to Deputy Magee. However, notwithstanding Plaintiff's allegations that as many as three other deputies assisted Deputy Magee, there is no evidence that other officers were at the scene during the arrest.

[5] Plaintiff states UMF No. 18 is disputed, Response at 4, but he presented no evidence to contradict UMF No. 18. *See* fn. 3 *supra*. The Court does not agree that Deputy Magee's testimony about Plaintiff "pulling away" from the deputies is inconsistent with Deputy Broyles' testimony that Plaintiff "raised his arms." *See* Response at 6–7. Deputy Broyles testified that the two deputies were not able to get Plaintiff's hands behind his back and that as a result, they had to "take him to the ground" to handcuff him. Broyles Dep. at 31.

Deputy Magee, Plaintiff was "set down as gently as one can possibly be in that scenario." Magee Dep. at 20–21. In contrast, Plaintiff alleges that the deputies "slammed him to the ground on his face," causing injuries to his head, back, and arms. Complaint ¶ 5; UMF No. 38. Plaintiff gave varying testimony about whether deputies hit him, shook him, and/or kicked him during the arrest. UMF Nos. 40–46. Although Plaintiff admits that he gave inconsistent testimony about whether the deputies used their hands to strike him and about the number of deputies who allegedly hit or kicked him, Response at 9, Plaintiff blames the discrepancies in his sworn testimony on a language barrier. UMF No. 21.

The Court carefully reviewed Plaintiff's deposition testimony about the number of deputies present at the scene, the amount of force the deputies used in handcuffing him, and the injuries Plaintiff sustained. Plaintiff testified that a total of three or four deputies were on top of him, hitting and kicking him. Plaintiff's Dep. at 33, 38, 45–46. Plaintiff remembered that at least two deputies were on both sides of him when he was on the ground and that they were kicking him. *Id.* at 38. The deputy was "kicking me on my lower left side towards the bottom rib cage. The other officer was on the other side of my, my bottom rib cage as well, so I was getting it on both sides from them." *Id.* at 38–39. Plaintiff testified that the deputies kicked him in both sides "maybe two, two, maybe three" times. *Id.* at 70–71. The first kick was the "hardest" and then the other kicks "got progressively lighter." *Id.* at 71.

When asked how the deputies "battered him," Plaintiff stated that they "battered me, kicked me, hit me in the head. My head hit the ground and damaged my fistula for dialysis." *Id.* at 24. "[T]he four [deputies"] had hit me." *Id.* at 60. Seconds later in his deposition, Plaintiff testified that "Magee was hitting me and shaking me and kicking me on my head, too." Plaintiff clarified that his head was "roughed up" while he was being shaken on the asphalt. *Id.* When

asked if Deputy Magee hit him, Plaintiff responded: "Yes, on the ground. Pulled me down. My forehead was on the ground. He hit my head against the ground." *Id.* at 60–61. When asked if any of the officers struck him with their hands, Plaintiff testified: "Yes." [A]ll of them." *Id.* at 61–62. Defense counsel asked: "They used their hands to grab you and hold you and shake you. But no one actually balled their hand up in a fist and struck you; is that correct?" Plaintiff responded: "Yes. Yes, they did." "Well, they hit me, they shook me, they used their hands and then hit—at that point they shook me." *Id.* at 62.

Plaintiff stated that an officer "grabbed my arm where my fistula is, damaged that area…. They took me to the hospital and they couldn't put a shunt in there. They instead had to put a new one [fistula] in my other arm." *Id.* at 25. Plaintiff alleged in the Complaint that his "right arm is permanently destroyed for dialysis" and that he had to have a new fistula placed in his left arm." *See id.* at 67. Plaintiff complained of bruises from having been kicked. *Id.* at 39. Plaintiff suffered an "injury on my head and I had headaches and an injury to my sides because they both kicked me." *Id.* at 69. Plaintiff did not see bruises from being "battered" but felt pain. *Id.* at 71.

There was evidence that Plaintiff had problems with the use of his right-arm fistula for dialysis before the October 20, 2011 arrest and that he continued to use the injured right-arm fistula for dialysis after October 20, 2011. *Id.* at 74–75, 87. Moreover, ambulance and hospital medical records from October 20, 2011 indicate Plaintiff's chief and only complaint was a forehead abrasion. UMF 31, Motion for Summary Judgment, Exhibits. I, L. Plaintiff, however, contends that the ambulance personnel did not communicate with him during the ride to the hospital and that "somehow they were working together, the law enforcement as well as the ambulance EMTs, paramedics what not, that they were taking advantage of being able to speak to each other without my knowledge." Plaintiff Dep. at 78. Once Plaintiff arrived at the hospital,

he complained about his head, his back, his sides, his right arm and the "pain in all of those areas." *Id.* at 79. However, the Presbyterian Nursing Record, dated October 20, 2011, noted only the forehead abrasion. *Id.* at 80, Ex. L. According to Plaintiff, the nursing staff did not take his complaints seriously or was indifferent. *Id.* at 83, 84. Plaintiff's failure to produce evidence of any serious injury might suggest that Defendant deputies' use of force was objectively reasonable under the circumstances. *See Westfahl v. Dist. of* Columbia, __ F. Supp. 3d __, 2014 WL 6999078, at *3 (D.D.C. 2014).

Moreover, County Defendants argue at length that the Court should not accept Plaintiff's "conclusory" or "inconsistent" allegations about the amount of force used to arrest him. Motion for Summary Judgment at 10–11. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" *Quinn v. Young*, __ F.3d __, 2015 WL 1089573, at *3 (10th Cir. 2015) (citation omitted). Notwithstanding this general principle, the Court must construe the evidence in the light most favorable to the non-movant Plaintiff. *Id.* While Plaintiff's varying testimony is not convincing, the Court cannot say that Plaintiff's testimony is "blatantly contradicted by the record." Plaintiff repeatedly testified that that Deputy Magee and other deputies hit him and kicked him. There are some discrepancies in Plaintiff's testimony, but it is possible that Plaintiff's hearing impairments interfered with his ability to understand the circumstances of his arrest. Indeed, Plaintiff's hearing and speech impairment could have compromised his ability to understand why, upon exiting his car, the deputies were suddenly grabbing his hands and then forcing him to the ground. Deputy Magee testified that, for safety reasons, he would not have informed Plaintiff that he was being arrested before he handcuffed

14

him. Thus, Plaintiff did not necessarily know that he was about to be handcuffed or arrested. Magee Dep. at 17–18.

### 4.   *Special Characteristics of Plaintiff*

In evaluating all of the circumstances, the Court considers Plaintiff's special characteristics, i.e., his speech and hearing impairment. This is appropriate because Deputy Magee "quickly understood" after stopping Plaintiff's vehicle that Plaintiff had a speech impairment or could not speak to him. *Id.* at 11–12. Yet, according to Plaintiff, Deputy Magee did not communicate with him in writing and Plaintiff did not know that he was being arrested or why he was  being "pulled out" of his car. Plaintiff's Dep. at 23, 25–26, 40, 55.

The Court acknowledges a dispute in the evidence with respect to Deputy Magee's alleged efforts to communicate with Plaintiff in writing. But, even Deputy Magee testified that he would not have shown Plaintiff the notes explaining the arrest until after Deputy Magee arrested Plaintiff. Magee Dep. at 17. County Defendants presented copies of two handwritten notes that Deputy Magee allegedly showed Plaintiff. Motion for Summary Judgment, Ex. C. The notes are undated and not printed on any type of official form. Moreover, Deputy Magee never logged the notes into evidence and did not attach the notes to his Uniform Incident Report. *Id.* Ex. E. Instead, Deputy Magee testified that he wrote these notes in a notebook that he kept for an unspecified period of time before destroying the notebook, even though Deputy Magee understood the notes were evidence. Magee Dep. at 26–28. It is troubling that Deputy Magee failed to properly retain evidence of this nature and that he could not explain why his belt recorder was not operating on the date in question. Magee Dep. at 16.

D.  Conclusion

After considering all of the circumstances, the Court finds that it would not have been objectively reasonable under the Fourth Amendment for two deputies to have hit and kicked Plaintiff while he was already on the ground and being handcuffed. The arresting deputies were not threatened by Plaintiff and there was no evidence that Plaintiff was engaging in threatening or combative conduct. Because Plaintiff has raised a genuine dispute as to how much force was used during the October 20, 2011 arrest and whether that force was objectively reasonable, the Court will deny Defendants' request for summary judgment on the Fourth Amendment excessive force claim.

Under the qualified immunity analysis, the Court determines whether a reasonable officer could have believed that the conduct in question did not violate clearly established law. In *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991), the Tenth Circuit Court observed that with respect to Fourth Amendment excessive force claims, "the qualified immunity question is usually answered in the Fourth Amendment inquiry." (citation omitted). "This is because, in the excessive force context, the Fourth Amendment inquiry asks directly whether the police officer reasonably could have believed that the force was necessary under the circumstances." *Id.*

The Court has already determined that under Plaintiff's version of events, a police officer would not have reasonably believed that the force allegedly used by the deputies was necessary under the circumstances. This does not preclude County Defendants from reasserting the qualified immunity defense at and after trial when the factual disputes have been resolved. At this time, however, material factual disputes remain as to how much force was used in handcuffing and arresting Plaintiff. Therefore, the Court denies County Defendants' request for

16

qualified immunity on the Count I Fourth Amendment excessive force claim, which will proceed.[6]

### III.   FAILURE TO TRAIN AND SUPERVISE CLAIM (Count VI)

Plaintiff alleges that the "[i]nadequacy of training and supervision provided to Defendant Magee and John Does 1–3 (sic) amounted to negligent, grossly negligent and deliberate indifference to Plaintiff's rights." Complaint ¶ 37. "The actions of Defendants' supervisors to train and supervise Defendants in a manner which encouraged tortuous (sic) conduct and civil rights violations of Plaintiff, resulted in Plaintiff being denied his constitutionally protected rights to property and liberty and in further tort violations." *Id.* ¶ 39. "The failure of Defendants' supervisors to provide adequate training and supervision of Defendants was an official policy, custom or act." *Id.* ¶ 40.

Plaintiff's Count VI allegations might be read to seek damages under two theories: 1) municipal liability on the part of the Bernalillo County Sheriff's Department (BCSO)[7] for failure to train or supervise its deputies and 2) supervisor liability on the part of Sheriff Dan Houston for failure to train or supervise the deputies.

### A.   Municipal Liability for Failure to Train or Supervise

The only "municipality" Plaintiff seeks to hold liable under 42 U.S.C. § 1983 for failure to train is BCSO. No other municipal defendant is named in the Complaint. However, police and sheriff's departments are not suable entities under § 1983 because they lack legal identities apart from the municipality. *Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985) (holding that the

---

[6] The Court clarifies that the Fourth Amendment Excessive Force claim proceeds against Deputy Magee, the only Defendant for whom there are allegations of personal participation. *See Trujillo v. Williams*, 465 F.3d 1210, 1228 (10th Cir. 2006) ("In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation … must be established.").

[7] The County Defendants' Motion for Summary Judgment refers to Defendant Bernalillo County Sheriff's Department as Bernalillo County Sheriff's Office (BCSO). Motion for Summary Judgment at 21. The Court, therefore, uses BCSO in referring to Defendant Bernalillo County Sheriff's Department.

City of Denver Police Department is not a suable entity), *vacated as moot*, 800 F.2d 230 (10th

Cir.1986) (no controversy because plaintiff withdrew from the case); *Dean v. Barber*, 951 F.2d

1210, 1214 (11th Cir. 1992) ("Sheriff's departments and police departments are not usually

considered legal entities subject to suit[.]"), citing *Martinez v. Winner,* 771 F.2d at 444 (10th Cir.

1985). *See also Henry v. Albuquerque Police Dep't*, 49 F. App'x 272, 274 n. 1 (10th Cir. 2002)

(unpublished) ("The district court properly relied on an unpublished decision from this court

holding that the Albuquerque Police Department lacks a legal identity apart from the City of

Albuquerque."); *Hollis v. Creek County Sheriff's Office*, 2013 WL 6074165, at *2 (N.D.Okla.

Nov. 18, 2013) (unpublished) (holding that the Sheriff's Office is not a proper defendant and

collecting similar cases).

Plaintiff's Count VI municipal liability claim against the Bernalillo County Sheriff's

Department is subject to dismissal on this basis alone.[8] However, the Court will assume for

purposes of deciding this Motion for Summary Judgment that a sheriff's department can be sued

under § 1983. For the following reasons, the Court reaches the same result – the County VI

municipal liability claim against BCSO must be dismissed.

Municipalities are not liable for the constitutional torts of their employees on a

respondeat superior basis. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a

municipality is liable for constitutional violations that the municipality has directly caused. *Id.*.

"[A] municipality is liable only when the official policy is the 'moving force' behind the injury

alleged." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (quotation omitted). "A

plaintiff suing a municipality under §1983 must prove: (1) that a municipal employee committed

a constitutional violation, and (2) that a municipal policy or custom was the moving force behind

---

[8] Defendants did not raise this ground in support of dismissal of the municipal liability claim against BCSO.

the constitutional deprivation." *Becker v. Bateman,* 709 F.3d 1019, 1025 (10th Cir. 2013) (citation omitted).

With respect to a municipal liability claim for failure to train, plaintiff must also prove that the municipality acted with deliberate indifference. *Barney*, 143 F.3d at 1307. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference has been shown where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

With respect to the first element of a municipal liability claim, the Court has decided that genuine disputes of material fact exist as to whether Defendant deputies used excessive force in arresting Plaintiff. *See supra*. The second part of the test requires identification of a policy, custom, or practice that was the moving force behind the alleged constitutional violation. The only purported policy Plaintiff has identified in support of the municipal liability claim is a "standard operating procedure" in BCSO's "Rules and Regulations."[9] Response, Ex. 2. Plaintiff emphasizes the following portion of the pertinent SOP:

> 1. In those situations where a deputy has probable cause to make an arrest or issue a criminal citation, without having to interview the suspect with a hearing impairment, the deputy does not have to provide a signer, except for the following situation:

---

[9] The County Defendants argue that Plaintiff cannot rely on a violation of a SOP to support his claims and that evidence of an SOP is not admissible. Reply at 2–3. The County Defendants do not dispute the existence of the SOP in question; rather their argument concerns questions of admissibility of evidence at trial. That argument can be raised, as needed, in a Motion in Limine at the appropriate time.

> a. if a deputy is unable to convey the nature of the criminal charges to the arrestee, the deputy must call a signer, unless the arrestee waives his/her right for a signer….
>
> b. if a deputy has stopped a suspect for committing a non-criminal (traffic) infraction and if the deputy is unable to convey to the violator the nature of the infraction, the deputy has the discretion to call a signer to the scene or issue a warning citation.

*Id.* Ex. 2 at 336. This SOP itself is not evidence of an unlawful policy or custom, but Plaintiff's position appears to be that the BCSO had an unofficial custom or practice of not following the SOP or of not training its officers about the SOP. For example, Plaintiff cites testimony by Deputy Magee, Deputy Broyles, and Sergeant Jason Foster that none of the officers realized there was a sheriff's department SOP addressing situations where a sign language interpreter should be called to the scene of an arrest to ensure effective communication with a hearing impaired individual. Magee Dep. at 8; Broyles Dep. at 16; Jason Foster Dep. at 10–11.

The officers' lack of knowledge about standard operating procedure is concerning. However, that evidence alone does not demonstrate that BCSO's alleged failure to train its deputies about the SOP is the "moving force" behind the alleged constitutional violation or that failure to abide by the SOP *directly caused* Plaintiffs' injuries. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation omitted), *cert. denied*, —— U.S. ——, 131 S.Ct. 3030 (2011). (requiring a showing of a *direct causal link between* the policy or practice and the alleged injury); *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) ("causation element is applied with special rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring") (citation omitted).

Evidence of a direct causal link between the BCSO's alleged failure to train officers about the SOP and Plaintiff's alleged injuries is missing. For example, there is no evidence of a longstanding practice that sheriff's department deputies used excessive force in arresting hearing impaired suspects. Put differently, Plaintiff did not show that Deputy Magee's lack of training about the SOP had any bearing on how much force was used in arresting Plaintiff.

To impose municipal liability on BCSO, Plaintiff must also show that the municipal actor's failure to train amounted to "deliberate indifference" to a constitutional violation. For example, if BCSO's actions in arresting hearing impaired suspects of crimes "so often violate constitutional rights that the need for further training must have been plainly obvious to the [municipal division]," then BCSO's failure to train deputies about the SOP directed at hearing impaired suspects might constitute deliberate indifference. *See City of Canton*, 489 U.S. at 390 n. 10. Plaintiff presented no evidence that the need for training about the SOP was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that BCSO could reasonably be said to have been deliberately indifferent. *See id.*, 489 U.S. at 390.

Other than the text of the SOP and the officers' testimony about the SOP, Plaintiff's only support for the municipal liability claim is the following four-sentence argument.

> Clearly Defendants are not entitled to summary judgment on (sic) municipal liability claims. Not a single deputy at the scene, including the acting supervising Sargent (sic) was aware that BCSO had an SOP for dealing with the hearing impaired. This is the very essence of a failure to adequately train and supervise (sic) and deliberate indifference.
>
> Just as clear is the fact that the moving force behind the injury was the failure of Defendants to effectively communicate with Plaintiff.

Response at 15. Plaintiff's summary recitation of some of the elements of a municipal liability claim is not evidence. Similarly, Plaintiff's unsupported conclusions that BCSO was deliberately

indifferent or that a failure to train was the moving force behind the injury do not raise genuine disputes of material fact.

Plaintiff's Count VI municipal liability claim against the BCSO fails because the BCSO is not a suable entity. Alternatively, Plaintiff did not raise genuine disputes of material fact as to the required elements of a municipal liability claim, sufficient to defeat the County Defendants' Motion for Summary Judgment. Accordingly, the Court will dismiss with prejudice Plaintiff's Count VI municipal liability claim against the BCSO.

B.  Supervisory Liability

Under § 1983, municipal supervisors are not vicariously liable for the misconduct of their subordinates. In other words, "there is no concept of strict supervisor liability under § 1983." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). A supervisor's mere right to control employees does not give rise to supervisory liability for the actions of subordinates. Similarly, a supervisor's knowledge of a subordinate's conduct is not enough to impose supervisory liability. *Schneider*, 717 F.3d at 767 (citation omitted). Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights." *Serna v. Colo. Dep't of Corrections,* 455 F.3d 1146, 1151 (10th Cir. 2006).

To establish a successful § 1983 claim against a defendant based on supervisory responsibilities, a plaintiff must present evidence of an affirmative link between the supervisor and the violation. The affirmative link requirement is comprised of three prongs: "(1) personal involvement; (2) sufficient causal connection; and (3) culpable state of mind." *Schneider*, 717 F.3d at 767 (citation omitted).

Plaintiff deposed Sergeant Jason Foster, who testified in part that he was Deputy Magee's supervisor during the pertinent timeframe. Jason Foster Dep. at 11. However, Plaintiff did not

name Sergeant Foster as a Defendant and there are no specific allegations about Sergeant

Foster's role, if any, at the time of the arrest.

      The only possible supervisor Plaintiff named in the Complaint is Sheriff Dan Houston.

There is no evidence that Sheriff Houston was Deputy Magee's supervisor, but assuming that

Sheriff Houston oversees all of BCSO's operations, it might be said that Sheriff Houston

supervises all BCSO deputies. Notwithstanding Sheriff Houston's position, Plaintiff presented no

evidence that Sheriff Houston was at the scene of Plaintiff's arrest or that he had any knowledge

of Plaintiff's arrest. The Complaint makes no allegations about Sheriff Houston other than to say

that Sheriff Houston is an employee of the Bernalillo County Sheriff's Department. Complaint

¶ 3. Indeed, all of Plaintiff's allegations about supervisory liability are general in nature. *See*

Complaint ¶ 38 ("Defendants' supervisors had a duty to provide adequate training for and

supervision of Defendants.").

      Plaintiff produced no evidence that Sheriff Houston: 1) personally participated in

Plaintiff's arrest; 2) directed the arrest of Plaintiff; 3) made any decisions regarding the amount

of force used to arrest Plaintiff; 4) promulgated policies and procedures pertaining to Plaintiff's

arrest; or, 5) failed to properly supervise the deputies involved in arresting Plaintiff. In addition,

there is no evidence of an "affirmative link" between the alleged constitutional deprivation and

Sheriff Houston's exercise of control or direction, or his failure to supervise. *See Fogarty v.*

*Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (citation omitted). For example, Plaintiff did not

establish the "requisite causal connection" by showing that Sheriff Houston "set in motion a

series of events that [Sheriff Houston] knew or reasonably should have known would cause

others to deprive the plaintiff of [his] constitutional rights." *See Schneider*, 717 F.3d at 768

(citation omitted). Finally, Plaintiff presented no evidence or allegations of Sheriff Houston's state of mind.

Plaintiff failed to raise genuine disputes of material fact on the required elements of a supervisory liability claim sufficient to defeat County Defendants' entitlement to summary judgment. To the extent that Plaintiff sought to bring a "state tort" claim of failure to train and supervise in addition to the § 1983 claim of failure to train and supervise, the state tort claim is duplicative. Accordingly, the Court will dismiss with prejudice Plaintiff's Count VI supervisory liability claim brought under § 1983 and under New Mexico state law against County Defendants.

## IV.    STATE LAW CLAIMS

A. <u>False Imprisonment</u> (Count IV)

Plaintiff alleges that Defendants' actions on October 20, 2011 "constituted false imprisonment." Complaint ¶ 29. Under New Mexico law, "false imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he had no lawful authority to do so." *Romero v. Sanchez*, 119 N.M. 690, 693 (1995). Plaintiff did not dispute that Deputy Magee had reasonable suspicion to stop Plaintiff's vehicle on October 20, 2011. Furthermore, the Court concluded that Deputy Magee had probable cause to arrest Plaintiff based on the misdemeanor arrest warrant Deputy Magee found when he ran Plaintiff's identification information through NCIC. Plaintiff did not contest the existence of an outstanding misdemeanor warrant for his arrest and failed to raise a genuine dispute of material fact regarding his Fourth Amendment unlawful arrest claim. Thus, Deputy Magee had the "lawful authority" to arrest Plaintiff, thereby precluding a claim of false imprisonment. *See Naves v. Hickerson,* 2010 WL 889985, *1 (E.D. Okla. Mar. 8, 2010) (unpublished) ("the focal

point of our analysis [into plaintiff's § 1983 false imprisonment claim] is the probable cause supporting plaintiff's arrest").

Plaintiff cannot satisfy the elements of a false imprisonment claim based on the Court's determination that Deputy Magee had probable cause to arrest. Accordingly, the Court will dismiss with prejudice Plaintiff's Count IV False Imprisonment claim.

B. <u>Assault and Battery</u> (Counts II and III)

Under New Mexico law, for an assault to occur, there must have been an "act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery." *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1208 (10th Cir. 2006) (citing N.M. Stat. Ann. § 30–3–1(B)). In support of the Assault claim, Plaintiff alleges that: 1) "Defendants threatened Plaintiff both implicitly and explicitly[;]" 2) "Defendants' threats caused Plaintiff to fear for his personal safety and for his life[;]" 3) "Defendants' threats would have caused a reasonable person to fear for his personal safety and for his life[;]" and 4) "Defendants' actions directly and proximately caused Plaintiff harm in an amount to be proved at trial." Complaint at ¶¶ 17–20.

"Battery occurs when an individual "acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and ... an offensive contact with the person of the other directly or indirectly results." *Id.* at 1209 (citing *State v. Ortega*, 113 N.M. 437 (1992)). In support of the Battery claim, Plaintiff alleges that "Defendants' actions constituted unlawful touching of Plaintiff in a rude, offensive, or angry manner" and that Defendants' actions caused Plaintiff harm. Complaint at ¶¶ 24–25.

Plaintiff's claims of assault and battery arise from the same allegations that support his excessive force claim. Plaintiff's state tort claims, similar to the excessive force claim, involve

determinations about the reasonableness of the law enforcement officers' action. *Mead v. O'Connor*, 66 N.M. 170, 172–73 (1959) (in deciding whether a state police officer was liable for assault, the fact finder was required to determine if the officer used "such force that was reasonably necessary under all of the circumstances"); *St. John v. McColley*, 653 F. Supp. 2d 1155, 1165 (D.N.M. 2009) (concluding that a jury must determine whether defendant law enforcement officials acted reasonably and in good faith in relation to battery claim).

Although Plaintiff did not produce compelling evidence in support of the excessive force claim, the Court concluded that genuine disputes of fact exist concerning the amount of force that Defendant deputies used in arresting Plaintiff and the objective reasonableness of that force. The same factual disputes preclude summary judgment and defeat County Defendants' entitlement of qualified immunity on Plaintiff's state law assault and battery claims. *See* discussion *supra*. Therefore, the Court denies Defendants' Motion for Summary Judgment on the Count II Assault and Count III Battery claims that will proceed against Deputy Magee.

C.  Intentional Infliction of Emotional Distress ("Outrage") (Count V)

Plaintiff alleges that "Defendants intentionally caused emotional distress to Plaintiff" and caused Plaintiff to suffer "extreme and severe mental anguish." Complaint ¶¶ 33, 34. New Mexico has recognized the tort of intentional infliction of emotional distress (IIED) in circumstances where a party "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Schmitz v. Smentowski*, 109 N.M. 386, 393 (1990); *Coates v. Wal-Mart Stores, Inc*., 127 N.M. 47, 57 (1999). However, Plaintiff's IIED claim cannot survive against individual Defendants Houston and Magee because they are entitled to immunity under the New Mexico Tort Claims Act. (TCA).

The TCA generally provides immunity from suit for intentional tort claims brought against governmental entities and public employees acting in their official capacities unless there is a specific waiver of that immunity. *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dept.*, 121 N.M. 646, 649 (1996); NMSA 1978, § 41–4–4(A) (2001). Section 41–4–12 of the TCA sets out the pertinent waiver of immunity for acts or omissions by a law enforcement officer, listing a number of specific torts for which a law enforcement officer is not entitled to immunity from suit. For example, while there is a waiver of a law enforcement officer's immunity from suit for claims of assault and battery, § 41–4–12 does not waive a law enforcement officer's entitlement to immunity against IIED claims.

> The immunity granted [by Section 41-4-4 NMSA 1978] does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41–4–12. Moreover, the New Mexico Court of Appeals has affirmed dismissal of an IIED claim where the plaintiff failed to identify a recognized exception to immunity under the TCA. *Silva v. Town of Springer,* 121 N.M. 428, 435 (Ct. App.), *cert. denied*, 121 N.M. 375 (1996). *See Salazar v. City of Albuquerque*, No. CIV 10–0645 JB/ACT, 2013 WL 5554185, at *41 (D.N.M. Aug. 20, 2013) (unpublished) (applying New Mexico law to conclude that the TCA did not waive immunity for IIED claims).

Plaintiff's Complaint does not mention the TCA or identify an exception to immunity under the TCA. Similarly, Plaintiff's Response fails to mention the IIED claim, to provide any support for IIED, or to respond to County Defendants' position that the IIED claim is subject to

dismissal. Plaintiff's failure to discuss the IIED claim in the Response may be deemed

abandonment of that claim. *Maestas v. Segura*, 416 F.3d 1182, 1190 n. 9 (10th Cir. 2005)

(plaintiffs abandoned claims "as evidenced by their failure to seriously address them in their

briefs"). *See* D.N.M. LR-Civ. 7.1(b) (the failure of a party to file and serve a response in

opposition to a motion … constitutes consent to grant the motion.").

There is no waiver of County Defendants' immunity from suit under the TCA for claims

of IIED. In addition, Plaintiff has abandoned the claim of IIED. Accordingly, the Court will

dismiss with prejudice Plaintiff's Count V IIED claim.

## V.     CLAIMS AGAINST JOHN DOE DEFENDANTS

Plaintiff's Complaint, filed August 15, 2013, apparently asserts all seven claims against

County Defendants and "Deputies John Doe 1–5." Complaint at 1. The only mention of the

"John Doe" Defendants in the Complaint is: "Defendant Magee, along with John Does 1–3 (sic),

were inadequately trained to communicate with the hearing impaired." Complaint ¶ 5.

Defendants argue that the § 1983 claims against the John Doe Defendants should be dismissed

because Plaintiff did not establish what action is attributable to each unidentified deputy. Motion

for Summary Judgment at 19 n.2. A showing that a defendant's personal participation caused a

deprivation of a federal right is essential to a 42 U.S.C. §1983 claim. *See Trujillo v. Williams*,

465 F.3d 1210, 1227 (10th Cir. 2006) (a defendant's direct personal responsibility for a claimed

deprivation of a constitutional right must be established).

Plaintiff has had well over a year to obtain the identities of the John Doe Defendants,

serve them with the Complaint, and make them parties to the lawsuit. Plaintiff has failed to do

so. Rule 4(m) authorizes dismissal of a defendant who is not served within 120 days after the

complaint. Fed. R. Civ. P. 4(m). Thus, the deadline for service on the John Doe Defendants

expired long ago. Moreover, Plaintiff failed to raise any argument in his Response in opposition to County Defendants' request that the John Doe Defendants be dismissed.

Because Plaintiff is unable to identify the John Doe Defendants or to show how each of the John Doe Defendants personally participated in a violation of Plaintiff's constitutional rights for purposes of the § 1983 claims, the Court will dismiss with prejudice all claims against "Deputies John Doe 1–5."

## Conclusion

County Defendants are entitled to summary judgment on the following claims: 1) Count I Fourteenth Amendment excessive force claim; 2) Count IV false imprisonment claim; 3) Count V Intentional Infliction of Emotional Distress or "Outrage" claim; 4) Count VI municipal liability and supervisory liability claims of failure to train and supervise; 5) Count VII Fourth Amendment claims of an unlawful stop and an unlawful arrest. All claims brought against the John Doe Defendants will be dismissed.

The following claims will proceed against Deputy Magee: 1) Count I Fourth Amendment excessive force claim; 2) Count II state law assault claim; and 3) Count III state law battery claim.[10]

**IT IS ORDERED that** COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 53) is GRANTED in part and denied in part, with the result that:

1)  Plaintiff's Count I claim under 42 U.S.C. § 1983 for Fourteenth Amendment excessive force violations against all Defendants will be dismissed with prejudice;

2)  Plaintiff's Count IV state law claim of false imprisonment against all Defendants will be dismissed with prejudice;

---

[10] This case does not appear to have been scheduled for a settlement conference. The parties should assess whether a settlement conference would be useful, and if so, take the necessary steps to have United States Magistrate Judge Yarbrough schedule a settlement conference.

3) Plaintiff's Count V state law claim of intentional infliction of emotional distress ("Outrage") against all Defendants will be dismissed with prejudice;

4) Plaintiff's Count VI claims under 42 U.S.C. § 1983 and New Mexico state law of municipal liability and supervisory liability for failure to train and supervise against all Defendants will be dismissed with prejudice;

5) Plaintiff's Count VII claim under 42 U.S.C. § 1983 for Fourth Amendment unlawful stop and unlawful arrest violations against all Defendants will be dismissed with prejudice;

6) All claims against "Deputies John Doe 1–5" will be dismissed with prejudice; and

7) Plaintiffs Count I claim under 42 U.S.C. § 1983 for Fourth Amendment violations of excessive force against Defendant Magee will proceed; and

8) Plaintiff's Count II and Count III New Mexico state law claims of assault and battery against Defendant Magee will proceed.

_____

SENIOR UNITED STATES DISTRICT JUDGE